## MURPHY v. LEHIGH VALLEY R. CO. (SCHIAVONE–BONOMO CORPORATION, Third-Party Defendant).
### No. 33, Docket 20192.

Circuit Court of Appeals, Second Circuit.
Dec. 2, 1946.

482

William Paul Allen, of New York City (Francis L. McElroy, of Syracuse, N. Y., of counsel), for plaintiff-appellee.

Alexander & Green, of New York City (Donald M. Dunn and Eugene Z. DuBose, both of New York City, of counsel), for defendant and third-party plaintiff-appellant.

Before AUGUSTUS N. HAND, CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

· The appeal is from a judgment of the District Court for the Eastern District of New York entered on the verdict of a jury, reduced in accordance with the consent of the plaintiff to prevent the granting of defendant's motion to set it aside as excessive.

The action was brought by the plaintiff, the widow of a brakeman employed by the defendant railroad, in her capacity as domiciliary administratrix under general letters of administration granted by the Surrogate's Court of Hudson County, New Jersey within whose jurisdiction the plaintiff resides and resided with her husband at the time of his death. Later, and after her capacity to bring this suit was questioned she was appointed ancillary administratrix by the Surrogate's Court of Kings County, New York, within whose jurisdiction the decedent left no tangible property. That issue has now been abandoned by the defend-

ant because of our decision in Briggs v. Pennsylvania Railroad Co., 2 Cir., 153 F.2d 841, 163 A.L.R. 1281.

The suit was brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. to recover damages for the death of the plaintiff's husband who was killed early in the morning of December 11, 1943, when at work helping switch freight cars which were in the yard of the Schiavone-Bonomo Corporation at Jersey City, New Jersey, on tracks that connected with those of the defendant. There were two tracks inside that yard, now to be called respectively the north and the south tracks, on each of which three freight cars were standing when the defendant's switch engine went there about six o'clock. It was very dark and the wind was blowing from the north at gale force. The crew would ordinarily have included a conductor, an engineer, a fireman, and two brakemen, but one of the brakemen had just before been excused by the conductor, with the consent of the decedent, because he had already worked an overlong shift.

When the engine approached the Schiavone-Bonomo yard two employees of the corporation opened gates made of corrugated iron on wooden frames which had been closed across the track leading into the yard. These gates swung, one to the south and one to the north outwardly from the yard, and were fastened in their opened position by the employees of Schiavone-Bonomo. The south gate was opened about 180 degrees and fastened by a hook parallel to the fence of which it was a part. The north gate, however, was opened only about 90 degrees and was fastened in that position by means of a rod attached to it which was pushed down into an iron pipe sunk in the ground. Originally this rod had gone down into the pipe for a distance of about a foot but dirt had been allowed to accumulate in the pipe so that on the morning of the accident the entry of the rod was only about two inches. That fastening was all that held the north gate open against the gale blowing from the north. These gates were each about eight feet high and 12½ feet long and when closed met in the middle of the track leading into the yard.

After the gates were opened and fastened as just described, the conductor went to the yard office of Schiavone-Bonomo Corporation where he was given what is called a drill slip which showed that the car at the westerly end of the three on the south track was to be left in the yard and that the other five were to be removed. The westerly car on the north track was not coupled to any others and was so near that part of the south track which led into the switch joining the two yard tracks that it had to be pushed back to allow clearance before the cars on the south track could be pulled out. Pushing this car out of the way was the first thing done. Then the conductor told the brakeman to have the switcher couple onto the three cars on the south track, pull them out beyond the switch and bring them back through the switch to the north track to couple on the three cars there. The conductor after this was busy within the yard removing a metal drum which was back of the first car that had been moved and between it and the other two cars on the north track.

In this setting the accident occurred as follows. The brakeman stepped on the footboard of the switcher which was then west of the switch point outside the yard after having closed the switch into the south track. In response to his signal to the engineer the switcher moved in and stopped when the coupling was made to the three south track cars and then pulled the three cars out beyond the switch. The brakeman rode out to the switch point on the rear footboard of the engine, got off there and stopped the movement by signalling the engineer when the cars were clear. He then closed the switch into the north track and while at the switch point doing that he was about 10 feet outside the Schiavone-Bonomo fence and about three feet northerly of the track leading into the yard. As the track curved southerly from the switch point toward the railroad's main line to the west of the yard the brakeman then had to go out westerly about 10 or 15 feet to signal the engineer to back into the yard. He did that and the backward movement began in response to his signal but after only about five feet was covered the signal became invisible to the engineer who stop-

ped at once in conformity to Rule 1179 of the defendant which provides that, "When switching cars, and depending upon signals from trainmen, the movement must not be started until the proper signal has been given, and the movement must be stopped immediately if the signals cannot be seen or are not understood." The brakeman's backing signal was again seen by the engineer who again started backing but again lost sight of the signal. This time, however, the engineer did not stop when the signal could not be seen but continued backing until he felt a jar when the cars in the movement were coupled to the westerly car on the north track. He then stopped. He had not noticed the occurrence of anything unusual during the movement of the cars.

The conductor in the yard had, however, heard a crash before the cars were coupled together and it was discovered that the wind had blown the northerly gate from its rather insecure fastening and swung it against one of the cars being pushed into the yard. It was then crushed back and partly jammed into the yard. The brakeman had been killed. His body was found about five feet outside the yard but it was within the arc through which the north gate would normally swing. The upper half of it was between the rails and the lower half which had been severed was outside the northerly rail and a little westerly of the leading trucks of the second car from the engine. Both trucks of the third car from the engine and the leading trucks of the second car had evidently passed over it. His lighted signal lantern was upright on the ground about a foot from the northerly side of the track near the switch point and between that point and the fence.

There was evidence tending to show that the rule above quoted was interpreted in practice to mean that after a switching movement had been begun in response to a signal it would be stopped if and when, the engineer lost sight of the signal but that if the signal reappeared it would be continued although the signal disappeared after the second start had been made. This was squarely contradicted by other evidence to the effect that it was customary to follow the literal language of the rule and stop

whenever the signal could not be seen. The court submitted that question to the jury.

By suitable motions which were denied, the defendant-appellant preserved for review the sufficiency of the evidence to prove that its negligence was the proximate cause of the brakeman's death; the failure of the court to grant a mistrial when the plaintiff's attorney in his opening to the jury stated that the defendant had filed a third party complaint against the Schiavone-Bonomo Corporation; and the refusal to charge as requested.

After the verdict was returned on June 15, 1945 the defendant moved promptly to set it aside as excessive. Following consideration of that motion and the filing of a remittitur by the plaintiff to prevent its being granted judgment was entered on the reduced verdict on October 25, 1945, with interest from the date of the verdict. The defendant then moved to resettle the judgment. The motion was granted and upon the resettlement interest before the date of the judgment i. e., before October 25, 1945 was disallowed. The plaintiff has appealed on this point.

■ Whether it was negligence to continue the backing movement after the engineer lost sight of the brakeman's signal the second time; whether it was negligence to do the switching under the circumstances shown with only one brakeman; and whether, if the defendant was found to be negligent in either or both respects, its negligence was the proximate cause of the brakeman's death were, we think, clearly questions for the jury. It was reasonable to believe that it was the breaking loose of the gate and its swinging with the wind that so interfered with what the brakeman was doing that his signal disappeared from the view of the engineer. The latter had previously stopped the movement within five feet and presumably could have done so again. Had he done that it was reasonable for the jury to conclude that the brakeman would not have been run over as he was. Moreover had there been two brakemen the decedent might have relayed the signal through the helper to the engineer and been spared the danger of going out where his own signal could be seen by the engineer and where he was doubtless in the way of

the gate as it swung in against the cars. Though much depended upon circumstantial evidence, the actual circumstances were adequately shown and the reasonable inferences to be drawn from them were for the jury, Union Pacific R. Co. v. Hadley, 246 U.S. 330, 38 S.Ct. 318, 62 L.Ed 751; Blair v. Baltimore & O. R. Co., 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490. The question of proximate cause was to be determined accordingly. Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520.

■■ We need not decide whether the defendant's Rule 1179 was so free from ambiguity that its construction was for the court. In any event allowing it to be interpreted by the jury in the light of the conflicting evidence as to the practice concerning it did not harm the appellant. From its language and the other evidence there was ample to justify a finding that the rule was violated and since it was one promulgated by the defendant to govern the conduct of its employees doing such work it was within reason to decide that the failure to stop when the light disappeared the second time was negligence. Tennant v. Peoria & P. U. R. Co. supra, 321 U.S. at page 33, 64 S.Ct. at page 411. Finally it was sufficient for the plaintiff to show in order to recover under the Federal Employer's Liability Act that the railroad was negligent, and that its negligence was either in whole or in part the proximate cause of the brakeman's death. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 67, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967.

The railroad had filed a third party complaint against the Schiavone-Bonomo Corporation and at a conference in the judge's chambers before trial that action had been severed by consent. The plaintiff's attorney so told the jury in his opening, and when the defendant immediately moved for a mistrial the judge denied the motion and at once said, "I instruct the jury that the fact that the railroad filed a complaint against any third party is no concern of theirs. You are now trying an issue strictly between the railroad and the plaintiff. Is that clear? Schiavone-Bonomo, which was mentioned by counsel, is not in this case as a defendant or any other party. However,

under all of the facts in the case, it may be you will be called upon to determine whose negligence brought about this accident. Is that clear?

"Now, it may be that, instead of finding any blame on the part of the railroad, you would find it on the part of some other person who is not in this case, and, therefore, I am permitting counsel to make reference to what Schiavone-Bonomo's employees say they did—both sides may do it—so that you may get the whole picture as to how this accident happened and make your judgment accordingly." When the motion was still pressed by the defendant's attorney the court added,

"I say to you, members of the jury, that the existence of that other lawsuit is no concern of yours at all.

■ "Now, you have told me that you could try this case fairly, and I am taking your assurance now that you are going to limit yourselves to questions between this plaintiff and the railroad company, and the fact that there was once a claim pending against anybody else is a legal question which is no concern of yours at all." The subject was again mentioned in the charge when the jury was again cautioned in similar vein. It would be giving substance to shadows we think to hold that what was done amounted to reversible error. The jurors would be inevitably informed as the trial progressed as to what had happened to the Schiavone-Bonomo Corporation's north gate and the condition of its fastening when it was opened and secured as it was by the employees of that corporation. It was evident that the railroad claimed that if any negligence was the proximate cause of the brakeman's death it was that of the Schiavone-Bonomo Corporation. It would be unreasonable to believe that any juror would suppose that the railroad would not pursue any legal rights it had against any third party and equally unreasonable, we think, to conclude that the fact that it had already taken some steps to do so could have influenced the jury adversely to it especially after the repeated caution by the judge.

■ Nor do we find error in refusing any requests to charge. They related in part to Rule 1179 as to which the action taken was, if error at all, more favorable to the appellant than it should have been in view of the language in the rule; and in part to the "usual practice" of brakemen in giving signals during such a switching movement, the point of these requests being that if the decedent failed to act in the customary way in giving the signals the jury might find either that the defendant was not negligent, or if negligent that such negligence was not the proximate cause of the decedent's death, or that the decedent's negligence was the sole proximate cause of his death. The judge in this connection charged the jury in part, "I am leaving all of this question of custom and its effect to you. Under the circumstances of this case, I am putting before you the evidence pro and con, and letting you say as a fact what the custom was, and then, from that point on, you can easily proceed, under the rules I have already given you." This was at least a substantial compliance with the appellant's requests and at most was perhaps more favorable to the appellant than it might well have been.

■■ On the plaintiff's appeal the judgment should be modified in respect to the allowance of interest. Had there been no pending motion to set aside the verdict judgment could, and should, have been entered forthwith but the clerk in accordance with the Rule 58, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. But after the motion was made it had to be decided before any judgment could be entered. The motion was granted conditionally with leave to the plaintiff to file a remittitur. This was done and the court made the judgment order on October 11, 1945. That was when the notation of the judgment in the civil docket should have been made and it became the judgment day. Rule 79(a). Since there was no date previous to October 11, 1945 on which the judgment could have, and should have, been entered it became the date from which interest was allowable. Louisiana & Arkansas R. Co. v. Pratt, 5 Cir., 142 F.2d 847.

Judgment modified by the allowance of interest from October 11, 1945 and, as modified, it is affirmed.