429 F.2d 1033
 Richard William GORSALITZ, Plaintiff-Appellee-Cross Appellant,
v.
OLIN MATHIESON CHEMICAL CORPORATION,
Defendant-Appellant-Cross Appellee, v. GENERAL ELECTRIC
CORPORATION, Third Party Defendant-Appellee, Electric Mutual
Liability Insurance Company, Intervenor-Appellee.
 No. 27807.
 United States Court of Appeals, Fifth Circuit.
 June 17, 1970, Rehearing Denied and Rehearing En Banc Denied
Aug. 18, 1970.
 
 B. Jeff Crane, Jr., Houston, Tex., for Olin Mathieson Chem. Corp.
 John H. Holloway, Houston, Tex., for Richard W. Gorsalitz.
 Sam H. Hood, Jr., Houston Tex., for G. E. Corp.
 Blake Tartt and John F. Nichols, Vincent W. Rehmet, Houston, Tex., for Intervenor Electric Mut. Liability Ins. Co.
 Before JOHN R. BROWN, Chief Judge, and RIVES and GEWIN, Circuit judges.
 RIVES, Circuit Judge:
 
 
 1
 The plaintiff, Richard W. Gorsalitz, sued the defendant, Olin Mathieson Chemical Corporation, for damages to compensate for extremely severe personal injuries sustained by the plaintiff while working on the premises of the defendant in Lake Charles, Louisiana.[1] The defendant Olin instituted a third party action for indemnity against the plaintiff's general employer, General Electric Company. The issues between the plaintiff and the defendant Olin were tried to a jury which returned a special verdict under Rule 49(a), Fed.R.Civ.P., answering Interrogatory No. 1, to the effect that the defendant was negligent in fifteen different respects; Interrogatory No. 2, that such negligence proximately caused the plaintiff's injuries; and Interrogatory No. 3, that plaintiff was not guilty of any act of contributory negligence.
 
 
 2
 The final two interrogatories and the jury's answers were as follows:
 
 
 3
 'Interrogatory No. 5:
 
 
 4
 'Do you find that the work which the plaintiff was doing at the time of the occurrence made the basis of this suit was part of the regular trade, business or occupation of the defendant Olin Mathieson Chemical Corporation?
 
 
 5
 'You will answer 'Yes' or 'No.'
 
 
 6
 'Answer: No. 'Interrogatory No. 6:
 
 
 7
 'What amount of money if now paid in cash, do you find from a preponderance of the evidence, will fairly and reasonably compensate the plaintiff, Richard William Gorsalitz, for the injury sustained by him on November 10, 1964?
 
 
 8
 'You will answer by stating the amount in dollars and cents.
 
 
 9
 'Answer: $1,380,000.00.'
 
 
 10
 The defendant Olin moved under Rule 50(b) for judgment n.o.v. and, in the alternative, for a new trial. Also, as third party plaintiff, the defendant moved for judgment for indemnity against the third party defendant, General Electric; which, in turn, moved to dismiss the third party complaint or, in the alternative, for a directed verdict in its favor.
 
 
 11
 The district court denied the defendant's motion for judgment n.o.v. It found that the verdict should be reduced from $1,380,000.00 to.$690,633.00 and that, if plaintiff filed an appropriate remittitur within twenty days, the motion for new trial would be denied. Otherwise the verdict would be set aside and the motion for new trial would be granted. The plaintiff filed the remittitur under protest and reserved his right to appeal. The court entered judgment for the plaintiff Gorsalitz (and the intervenor Electric Mutual) against the defendant Olin for.$690,633.00 with interest from the date of the judgment. It denied Olin's claim for indemnity and entered judgment in favor of the third party defendant, General Electric.
 
 
 12
 Olin appeals both from the judgment against it in favor of the plaintiff and the intervenor, and from the judgment denying its claim of indemnity against General Electric. Gorsalitz appeals from the final judgment and from the order conditionally requiring him to file a remittitur.
 
 Olin's Appeal Against Gorsalitz
 
 13
 Olin asserts against Gorsalitz a single claim of error, namely:
 
 
 14
 'POINT OF ERROR No. 1
 
 
 15
 'The District Court erred in failing to sustain this Defendant's Motion for instructed verdict in that the Plaintiff's exclusive remedies for such personal injuries as he may have sustained were under the Workmen's Compensation Law of the State of Louisiana.'[2]
 
 
 16
 To that claimed error Gorsalitz asserts four defenses:
 
 
 17
 'COUNTER-POINT NO. 1
 
 
 18
 'The Court of Appeals does not have jurisdiction of Appellant's Point No. 1, and defendant has waived appellate review of the jury finding that plaintiff was not a 'statutory employee' of defendant under Louisiana law and any error in denying a directed verdict as to such issue, because defendant did not file a motion to disregard the jury finding and for judgment non obstante verdicto under Rule 50(b), F.R.C.P., so as to properly preserve any error in the trial court's denial of its motion for directed verdict.
 
 
 19
 'COUNTER-POINT NO. 2
 
 
 20
 'The Court of Appeals does not have jurisdiction of Appellant's Point No. 1 because defendant did not file a motion for new trial asserting any error in the jury finding that plaintiff was not a 'statutory employee' of defendant under Louisiana law or contend that the trial court erred in refusing to direct a verdict on such issue.
 
 
 21
 'COUNTER-POINT NO. 3
 
 
 22
 'A federal court should apply the law of the forum where the forum has the greater interest in applying its own compensation laws, including its third-party practice, where the application of a sister state rule would be contrary to the public policy of the forum, where the contract was entered into in Texas and the compensation act is a part of such contract, where the place of injury would apply its own compensation laws if the facts were reversed, and where Texas has the most 'significant relationship' to the transaction.
 
 
 23
 'COUNTER-POINT NO. 4
 
 
 24
 'The trial court properly denied defendant's motion for directed verdict since a fact issue existed as to whether plaintiff's status is that of an independent contractor under R.S. 23:1021(6) of the Louisiana Compensation Act, and because defendant failed to establish that the work being performed by plaintiff is regularly performed repairs 'customarily' done by its own employees within the business, trade or occupation of the defendant.'
 
 I.
 
 25
 We find no merit in Gorsalitz's counter-points Nos. 1 and 2. Olin did file a motion under Rule 50(b) for judgment n.o.v. and in the alternative for a new trial, asserting as one ground that 'the Court erred in submitting to the jury over the timely and proper objections of this Defendant Interrogatories Nos. 1 and 2 and the sub-parts thereof.' However, Olin's objections to those two interrogatories were so phrased as not to assert a contention that plaintiff's exclusive remedies were under the Louisiana Workmen's Compensation Law. Nor did Olin's motion for judgment n.o.v. or for a new trial otherwise attack the jury's answer to Interrogatory No. 5.
 
 
 26
 We do not, however, agree with Gorsalitz's view that the cases upon which he relies[3] hold that a defendant's failure to move for judgment n.o.v. based on its 'no evidence' contention precludes appellate review of the denial of its earlier motion for directed verdict. Those cases go no further than to limit the remedy which may be granted upon such a review to ordering a new trial instead of directing entry of judgment for the defendant.[4] Further, a failure to file a motion for new trial based on the 'no evidence' contention would not preclude ordering a new trial as a remedy for erroneously denying a motion for directed verdict. So far as we are advised or have found, no court has ever so held. Such a holding would, we think, run counter to the provisions of Rule 59(d), Fed.R.Civ.P., that the district court 'of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party,' and, on appeal, would be contrary to the broad power of an appellate court to 'order, or require such further proceedings to be had as may be just under the circumstances.' 28 U.S.C. 2106.
 
 II.
 
 27
 Gorsalitz's counterpoint No. 3 to the effect that Texas law, rather than Louisiana law, should determine the question of whether Gorsalitz could maintain a tort action for damages against Olin is precluded by this Court's decision of the identical underlying question of law in Tucker v. Texas Company, 1953, 203 F.2d 918. We see no purpose in adding to the discussion of the question contained in that case, or in accepting Gorsalitz's implied invitation to consider overruling that case, unless we reach the conclusion that under Louisiana law the judgment should be reversed for failure to grant Olin's motion for a directed verdict.
 
 III.
 
 28
 On his counterpoint No. 4, Gorsalitz fares better. We find that the evidence presented a fact issue as to whether the work contracted for by General Electric was a part of Olin's 'trade, business, or occupation' within the meaning of LSA-R.S. 23:1061, quoted in n. 2, supra, and the jury's finding on that issue in its answer to Interrogatory No. 5 must be sustained.
 
 
 29
 By its answers to interrogatories, Olin admitted that, on October 21, 1964, it contracted with General Electric to effect repairs on two large transformers then located in Olin's plant at Lake Charles, Louisiana. They were the only transformers of such size and nature located in the plant. The two transformers were installed in 1948. Olin had never through its own employees performed any major repairs upon those transformers. Olin further answered the interrogatories:
 
 
 30
 'There are no employees working for Olin Mathieson Chemical Corporation qualified to make the repairs contracted out to General Electric and this is for the reason that it is more economical to subcontract this work due to its infrequent nature than it is to own and maintain the equipment necessary and train the employees to do such work, if and when the need arises within the plant.
 
 
 31
 'It is not true that any agreement had been reached as to whether or not the transformers would be removed to Houston, Texas, but it would logically follow that, if necessary, the equipment would be taken to Houston in the event it could not be repaired on location in the Olin Mathieson plant.
 
 
 32
 'Olin Mathieson Chemical Corporation does not own or maintain any tools or testing equipment in Lake Charles, Louisiana, necessary to carry out many of the tests and to filter the oil on the type of transformers being repaired by General Electric Company.'
 
 
 33
 Olin's supervisor of steam power and utilities, in Olin's employ for 24 years, testified that to buy the equipment to do this type of work would constitute 'an unjustified expenditure' for Olin, for example, a filter press to filter this type of oil would cost about $5,000.00.
 
 
 34
 An electrician employed by Olin for 18 years testified that Olin is not staffed to do the type of work contracted for by General Electric, and that during the past eighteen years Olin has contracted out that type of work either to General Electric or to Westinghouse.
 
 
 35
 Another electrician who had been employed by Olin for 24 years did not remember that these transformers had ever been serviced before.
 
 
 36
 'Q. I say, those transformers had been operating twenty-four hours a day for the last fifteen years before Mr. Gorsalitz was hurt?
 
 
 37
 'A. Yes, sir.
 
 
 38
 'Q. They've never been checked to see if there was any defects in the system?
 
 
 39
 'A. Not that I remember.'
 
 
 40
 Olin's purchasing agent, in its employ for 19 years, testified that this type of large industrial transformer was repaired under contract either by Westinghouse Electric Corporation or by General Electric.
 
 
 41
 An electrical contractor, familiar with the practice of industries in Louisiana and in the Gulf Coast area, testified that industrial organizations do not keep the type of equipment necessary to do this kind of checking and repair, but that this is a type of specialized repair and inspection, customarily contracted out either to General Electric or to Westinghouse.
 
 
 42
 Olin's manager of industrial relations testified that Olin is a very large corporation with operations throughout the world. It has 700 employees in its plant at Lake Charles, Louisiana, where it produces such inorganic chemicals as soda ash, caustic soda, ammonia, hydrocene, nitric acid and sodium nitrate. Just what service the two transformers perform in that business is not explained, but we think the inference is clear that the transformers are an integral part of the business. The critical question, however, is not whether the transformers themselves are essential to the business, but whether the work being done by Gorsalitz when he was injured was a part of Olin's trade, business or occupation.
 
 
 43
 Originally the district court simply submitted Interrogatory No. 5 in the form requested by the defendant Olin and without any explanation or instruction. After several hours' deliberation, the court received a note from the jury, upon which the Judge conferred in chambers with counsel and then instructed the jury:
 
 
 44
 'Ladies and gentlemen of the jury, I have your second note which reads, 'We need an explanation of Interrogatory Number 5,' signed 'Leon Williamson, foreman.'
 
 
 45
 'I will attempt to explain or clarify Interrogatory Number 5. It is agreed that the burden of proof to establish the affirmative of Interrogatory Number 5 is upon the defendant, Olin Mathieson Chemical Corporation. The pivotal issue is whether plaintiff's job was part of Olin's usual trade, business or occupation. The decisive factors are the nature of the employee's work and of the principle's trade, business or occupation. Unless the work is of such a special or separate character as would not ordinarily or appropriately be performed by the principal's own employees in the prosecution of its business or as an essential part thereof, it is part of the principal's trade, business or occupation.
 
 
 46
 'Does that clarify your question? Does that answer your question? 'FOREMAN OF THE JURY:
 
 
 47
 'Yes, your Honor. 'THE COURT:
 
 
 48
 'Very well. You may retire and resume your deliberations.'
 
 
 49
 After the jury retired, defendant Olin's counsel stated that while he agreed with the first part of the charge relating to burden of proof, he objected to the remainder of the instruction, but stated no grounds for his objection. Thus, under Rule 51, Fed.R.Civ.P., Olin has not preserved for review its objection to the court's instruction to the jury. It has, however, preserved for review its motion for a directed verdict based on the ground that the work being done by plaintiff Gorsalitz 'constituted a part of the trade, business and occupation of this Defendant; this Defendant was, therefore, in law Plaintiff's employer and Plaintiff's sole cause of action, if any, arising out of said occurrence is for Workmen's Compensation benefits.'
 
 
 50
 The State Courts' construction of the two State statutes involved is, of course, binding upon the federal courts in this diversity action. This Court has made a number of attempts to divine the meaning of the controlling Louisiana cases.[5] The district court in its instruction to the jury was following the language of this Court in Isthmian S.S. Co. of Delaware v. Olivieri, 1953, 202 F.2d 492, 494:
 
 
 51
 'The decisive factors are the nature of the employee's work and of the principal's trade, business, or occupation. Unless the work is of such a special or separate character as would not ordinarily or appropriately be performed by the principal employer's own employees in the prosecution of its business or as an essential part thereof, it is a part of the principal's trade, business or occupation.'
 
 
 52
 There are cases where the work is, as a matter of law, an essential and integral part of the principal's business.[6] Another line of Louisiana cases deals with activities incidental to or remotely connected with the principal's business.[7]
 
 
 53
 This Court's latest decision on the subject has said:
 
 
 54
 'that the test for determining whether an activity is part of an employer's trade or business for purposes of the Louisiana Workmen's Compensation Statute is whether the particular activity is essential to the business. The fact that the employer or the industry as a whole always contracts out the activity is not controlling.'
 
 
 55
 Arnold v. Shell Oil Co., 5 Cir. 1969, 419 F.2d 43, 50.
 
 
 56
 On the other hand, speaking of cases where the activities were more remotely connected with the principal's business, the Court of Appeals of Louisiana, Third Circuit, said:
 
 
 57
 'In determining whether the work in which the employee of the subcontractor is injured is part of the principal's business * * *, one relevant factor is whether such work is customarily considered a part of the regular business of employers performing through their own employees the work of the occupation in which the principal is engaged. Malone (Louisiana Workmen's Compensation (1951)), cited above, Section 125, p. 151; Best v. J. & B. Drilling Co., La.App. 3 Cir., 152 So.2d 119; Sam v. Deville Gin, Inc., cited above (La.App. 3 Cir., 143 So.2d 838) Applying this test, for instance, the repair of equipment is often considered a part of the principal's business, even though the injury is received by the employee of a subcontractor hired especially to perform the repairs. See e.g.: Best v. J. & B. Drilling Co., cited above; Stansbury v. Magnolia Petroleum Co., La.App. 1 Cir., 91 So.2d 917. See also Malone and Plant, Cases on Workmen's Compensation (1963), pp. 102-106, 'Repair, Construction and Maintenance as Part of the Employer's Business.'
 
 
 58
 'Here, however, the record is totally deficient as to any evidence as to whether those engaged in the stump cutting and hauling business customarily have their own employees repair their trucks as a part of their trade, business, or occupation, instead of having these repairs accomplished by specialized repair agencies. The present record thus does not show that the repair of a contractor's truck used in the performance of a contract to cut and haul logs is not a part of the principal's business within the meaning of the compensation act.
 
 
 59
 'As movant for the summary judgment, Franks' compensation insurer, the appellee, had the burden of showing clearly that such fact is undisputed, exculpating movant from liability; and all doubts in this regard are resolved against movant. Kay v. Carter, 243 La. 1095, 150 So.2d 27; Vallier v. Aetna Finance Co., La.App. 3 Cir., 152 So.2d 112, and cases therein cited. This burden the appellant movant has failed to sustain; accordingly, the motion for summary judgment was incorrectly sustained by the trial court and must be overruled by this court.'
 
 
 60
 Shird v. Maricle, supra, 156 So.2d at 478-479.
 
 
 61
 It is worth repeating that the district court charged the jury without objection that 'It is agreed that the burden of proof to establish the affirmative of Interrogatory Number 5 is upon the defendant, Olin Mathieson Chemical Corporation.' In objecting to the remainder of the instruction, Olin's counsel stated particularly that he concurred in this part of the charge relating to the burden of proof. Under the federal standard for testing the sufficiency of the evidence for submission of a case to the jury,[8] whether Olin had met its burden of proof was a question clearly within the jury's province to determine.
 
 
 62
 In the present case, the jury could reasonably and properly believe from the evidence (1) that the inspection and repairs being executed by Gorsalitz were not ordinary and regular maintenance but were part of an infrequent major overhaul made at irregular intervals, often exceeding eighteen or twenty years;[9] (2) that both Olin and the industry as a whole always contracted out such work either to General Electric or to Westinghouse;[10] (3) that neither Olin nor other employers in the industry could justify economically the large expenditures required for the equipment necessary for such inspection and repairs, nor those needed to maintain a staff of employees qualified to perform such infrequent and specialized service.
 
 
 63
 Since the evidence is ample to sustain such findings or beliefs, the jury could reasonably and properly conclude that Olin and the industry as a whole were not going counter to the statute in always contracting out the kind of work being performed by Gorsalitz. Since such contracts were always with either General Electric or Westinghouse, large corporations of undoubted solvency, no reasonable argument could be presented that the practice operated to defeat the purpose of the Louisiana statute:
 
 
 64
 'The purpose of the statutory liability of the principal to the employees of his subcontractor under LSA-R.S. 23:1061 is to prevent principals engaged in a hazardous business from contracting out their work to possibly impecunious subcontractors in order to evade the principal's liability for workmen's compensation benefits to employees utilized in the principal's trade, business, or occupation . See Malone (Louisiana Workmen's Compensation (1951)), cited above, Chapter 6, p. 140.'
 
 
 65
 Shird v. Maricle, supra,156 So.2d at 478. Indeed, for the jury to determine that the work being done by Gorsalitz at the time of his injury was part of Olin's regular trade, business, or occupation would be to depart from the purpose of the statute and instead to convert the statute into an instrument for forcibly treating a relationship as that of master and servant, which the parties themselves considered as principal and an independent contractor's employee, then a business invitee of the principal. Such an application of the statute would be a perversion of the meaning and intent of the statute. We conclude that the district court properly denied Olin's motion for a directed verdict.[11]
 
 Gorsalitz's Appeal
 
 66
 We come next to the several questions presented by Gorsalitz's appeal.
 
 A.
 
 67
 Does the granting of a remittitur in jury cases violate the Seventh Amendment's command that 'no fact tried by a jury shall be otherwise re-examined * * * than according to the rules of the common law'?
 
 
 68
 We agree with Professor Moore that the use of remittitur by federal district courts 'has become so universal * * *, and has had the apparent approval of so many Supreme Court cases, that it cannot be contended that its use is unconstitutional without a judicial uprooting of precedent akin to that effected by Erie-Tompkins,' 6A Moore's Federal Practice, 2nd ed., P59.05(3), pp. 3739, 3740.
 
 
 69
 The Supreme Court has repeatedly approved the practice. In Northern Pacific R.R. Co. v. Herbert, 1886, 116 U.S. 642, 646, 647, 6 S.Ct. 590, 29 L.Ed. 755, Justice Field speaking for the Court said:
 
 
 70
 '2. The exaction, as a condition of refusing a new trial, that the plaintiff should remit a portion of the amount awarded by the verdict was a matter within the discretion of the court. It held that the amount found was excessive, but that no error had been committed on the trial. In requiring the remission of what was deemed excessive it did nothing more than require the relinquishment of so much of the damages as, in its opinion, the jury had improperly awarded. The corrected verdict could, therefore, be properly allowed to stand.'
 
 
 71
 That holding and the remittitur practice were fully discussed by the elder Justice Harlan in Arkansas Valley Land & Cattle Co. v. Mann, 1889, 130 U.S. 69, 72-76, 9 S.Ct. 458, 32 L.Ed. 854, saying in part:
 
 
 72
 'The practice which this court approved in Northern Pacific Railroad v. Herbert is sustained by sound reason, and does not, in any just sense, impair the constitutional right of trial by jury. It cannot be disputed that the court is within the imits of its authority when it sets aside the verdict of the jury and grants a new trial where the damages are palpably or outrageously excessive.'
 
 130 U.S. at 74, 9 S.Ct. at 459.[12]
 
 73
 Remittitur is reconciled with the Seventh Amendment by Mr. Justice Sutherland speaking for the Court in Dimick v. Schiedt, 1935, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603:
 
 
 74
 'The controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the facts. In dealing with questions like the one now under consideration, that distinction must be borne steadily in mind. Where the verdict returned by a jury is palpably and grossly inadequate or excessive, it should not be permitted to stand; but, in that event, both parties remain entitled, as they were entitled in the first instance, to have a jury properly determine the question of liability and the extent of the injury by an assessment of damages. Both are questions of fact. Where the verdict is excessive, the practice of substituting a remission of the excess for a new trial is not without plausible support in the view that what remains is included in the verdict along with the unlawful excess-- in that sense that it has been found by the jury-- and that the remittitur has the effect of merely lopping off an excrescence.'[13]
 
 
 75
 In theory at least the plaintiff's constitutional right of trial by jury is preserved.
 
 B.
 
 76
 Was there sufficient factual basis to justify the trial court in conditionally requiring any remittitur?
 
 
 77
 The ground of defendant Olin's motion for new trial relating to damages reads as follows:
 
 
 78
 'The amount of damages found by the jury is so excessive and exorbitant as to demonstrate passion and prejudice on the part of the jury against this Defendant and is wholly unsupported by the evidence; in this connection, Defendant would respectfully show the Honorable Court that a finding of damages in excess of $600,000 is excessive.'
 
 
 79
 There was no claim of any improper argument or of any appeal to passion or prejudice in the introduction of evidence or the conduct of the trial. Instead, the district court found that the facts of the case, the severity of the injury and the medical treatment aroused undue sympathy on the part of the jury.[14] In demonstrating the inherent and unavoidable appeal to the sympathy of the jury, the learned trial judge wrote in his memorandum:
 
 
 80
 'The facts of this case were particularly of a type conducive to arouse the sympathy of the jury. Mr. Gorsalitz's injury and his subsequent medical treatments were extremely serious. The injury occurred when the plaintiff fell against a high voltage transformer; the entire right side of his head, the right arm and hand were severely burned. Dr. S. Baron Hardy, a specialist in plastic and reconstructive surgery, was called to testify on behalf of his patient. He testified that when he first saw the plaintiff on the afternoon of the injury, the plaintiff was comatose and in a critical condition. He was breathing through a tracheotomy tube due to swelling and inflammation of the face and neck. For the first forty-eight hours the principal treatment was for shock. Thereafter the burn treatments began. It soon became apparent that all the tissue on the right side of plaintiff's head and face had become necrotic; circulation in the unburned portion of the face was disturbed and could not sustain the tissues. During this time, composing several weeks following the injury, the plaintiff was either comatose or in a confused condition. When conscious he was in great pain and was administered pain medication often. During that same time the first grafts, to the neck, were performed. By May of 1965 all of the tissue and part of the bone of the right side of plaintiff's face had to be removed. To cover the exposed area, a massive skin graft was moved from the abdomen. The procedure entailed a series of stages over about a month's time, and caused the plaintiff extreme discomfort. For approximately a year he was forced to breathe through the tracheotomy tube, and was fed predigested food through a tube to his stomach, since he had no teeth or jaw bone joint on the right side of his face.
 
 
 81
 'Plaintiff was first discharged from the hospital in July of 1965, but returned in August for further surgical procedures. It is unnecessary to recount all the operations performed thereafter. It is sufficient to state that there were many, requiring varying periods of hospitalization up to the date of trial.
 
 
 82
 'The plaintiff was present each day of the trial; the severe disfigurement of his face was thus constantly before the jury as mute evidence of the terrible injury he had sustained four years prior.'[15]
 
 
 83
 This Court may review the district court's ruling on motion for new trial only for an abuse of discretion. Whiteman v. Pitrie, 5 Cir. 1955, 220 F.2d 914, 919, and cases there cited.[16]
 
 
 84
 In a recent case of this kind, Taylor v. Washington Terminal Company, 1969, 133 U.S.App.D.C. 110, 409 F.2d 145, cert. den. 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85, Judge Skelly Wright has evolved a practical test of 'abuse of discretion.' We quote at some length, omitting footnotes:
 
 
 85
 'It is by now standard doctrine that such orders may be reviewed for abuse of discretion, even when based upon such broad grounds as the trial judge's conclusion that the verdict was excessive or was against the weight of the evidence. There has been much discussion of the content which should be given to the elusive phrase 'abuse of discretion,' with the weight of learning against appellate reversal except in relatively rare cases.
 
 
 86
 'This learning has largely arisen from consideration of cases in which motions for new trial-- especially on the ground of excessive verdict-- have been denied. Two factors unite to favor very restricted review of such orders. The first of these is the deference due the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record. The second factor is the deference properly given to the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages. This second factor is further weighted by the constitutional allocation to the jury of questions of fact.
 
 
 87
 'Where the jury finds a particular quantum of damages and the trial judge refuses to disturb its finding on the motion for a new trial, the two factors press in the same direction, and an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial. However, where, as here, the jury as primary fact-finder fixes a quantum, and the trial judge indicates his view that it is excessive by granting a remittitur, the two factors oppose each other. The judge's unique opportunity to consider the evidence in the living courtroom context must be respected. But against his judgment we must consider that the agency to whom the Constitution allocates the fact-finding function in the first instance-- the jury-- has evaluated the facts differently.
 
 
 88
 'In this jurisdiction particularly, District Court judges have given great weight to jury verdicts. They have stated that a new trial motion will not be granted unless the 'verdict is so unreasonably high as to result in a miscarriage of justice,' or, most recently, unless the verdict is 'so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.'
 
 
 89
 'At the appellate level, in reviewing a trial judge's grant of a new trial for excessive verdict, we should not apply the same standard. The trial judge's view that a verdict is outside the proper range deserves considerable deference. His exercise of discretion in granting the motion is reviewable only for abuse. Thus we will reverse the grant of a new trial for excessive verdict only where the quantum of damages found by the jury was clearly within 'the maximum limit of a reasonable range."
 
 
 90
 409 F.2d at 147-149.
 
 
 91
 We think the same test should be applied in deciding whether the trial court erred in requiring some remittitur as a condition for denying a motion for new trial. Applying that test in the light of the present record, we think that the trial judge, in the exercise of his necessarily broad discretion, could properly find that some part of this large verdict resulted from undue sympathy on the part of the jury. We hold, therefore, that the district court did not err in conditionally requiring some remittitur, and pass on to the question of the amount of remittitur required.
 
 C.
 
 92
 What action should this Court take as to the amount of remittitur?
 
 
 93
 The jury answered Interrogatory 6 with one lump sum, $1,380,000.00 . In its memorandum the district court undertook to consider various elements of damage. As to 'loss of earnings from date of injury to trial,' it expressed the view that it was reasonable for the jury to award $46,213.00; as to 'loss of earnings from time of trial for life expectancy,' it stated, 'The court believes that $250,000.00 will reasonably compensate the plaintiff for loss of future earnings for the duration of his life'; as to 'medical expenses incurred to date of trial,' the court found a figure of $56,000.00; as to 'medical expenses from date of trial for life expectancy,' the court found that the jury could determine that an additional $66,120.00 in future medical expenses was probable. The court then said that 'The foregoing amounts total $490,633.00 which leaves $889,367.00 to pain and suffering,' and then considered the elements of 'pain and suffering, past and future,' finally concluding:
 
 
 94
 'It is the court's opinion that $889,367 allocable to pain and suffering is excessive, the result of undue sympathy on the part of the jury. It is further the court's opinion that the sum of $200,000 which approximates the maximum sum of past and future medical expenses, is a reasonable amount to award the plaintiff for pain and suffering.'
 
 
 95
 Gorsalitz, as appellant, vigorously attacks the court's computations of the various items of damages. We pretermit consideration of such detailed criticisms of the court's rationale because we agree with Gorsalitz's over-all attack that the court committed an error of law in failing to apply the proper test of excessiveness, which we hold was the maximum which the jury could reasonably find. We agree with the view expressed in 3 Barron & Holtzoff, Federal Practice & Procedure (Wright ed.) 1305.1, p. 376:
 
 
 96
 'There are some differences of opinion as to the standard by which the court should be guided in determining the amount of the remittitur. One theory is that an excessive verdict should be reduced to the minimum amount which the jury might have awarded, since award of any greater sum deprives the defendant of his right to a jury trial. Other courts have felt free to reduce the verdict, by remittitur, to that amount which the court itself considers the jury should have allowed. A final theory is that the jury by its excessive verdict intended to award the maximum and defendant cannot complain of any judgment within the permissible limits. This theory permits reduction only to the highest amount which the jury could properly have awarded. It is the only theory which has any reasonable claim of being consistent with the Seventh Amendment.'
 
 
 97
 We need not write at length on this standard applicable to determining the amount of remittitur because it has been so fully and ably discussed by Judge Rubin in Glazer v. Glazer, E.D.La.1968, 278 F.Supp. 476, 478-482. We adopt the rationale of Judge Rubin in that part of his opinion.
 
 
 98
 In the present case the district court simply substituted its view of a reasonable amount to award the plaintiff for the verdict of the jury. The forceful language of Mr. Justice Sutherland employed in another context in Dimick v. Schiedt, supra, would aptly describe the result of an affirmance of the amount of remittitur required by the district court:
 
 
 99
 'To so hold is obviously to compel the plaintiff to forego his constitutional right to the verdict of a jury and accept 'an assessment partly made by a jury which has acted improperly, and partly by a tribunal which has no power to assess."
 
 
 100
 293 U.S. at 487, 55 S.Ct. 301.
 
 D.
 
 101
 We come next to Gorsalitz's contention that interest on the final judgment should run from the date of return of the jury verdict.
 
 
 102
 Rule 58, Fed.R.Civ.P., prescribes the respective duties of the court and of the clerk as to the entry of judgment upon a verdict of a jury. Upon a general verdict for a sum certain 'the clerk, unless the court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction of the court.' 'Upon a special verdict or a general verdict accompanied by answers to interrogatories, the court shall promptly approve the form of the judgment, and the clerk shall thereupon enter it.' Rule 58 further provides that '(a) judgment is effective only when entered as provided in Rule 79(a).'
 
 
 103
 28 U.S.C. 1961 provides that 'interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law.' Article 5072 of Vernon's Annotated Texas Statutes provides in part that, 'All judgments in the courts of this State shall bear interest at the rate of 6% Per annum from and after the date of judgment * * *.'
 
 
 104
 The jury verdict was returned on October 10, 1968. One week later, on October 17, 1968, the defendant Olin filed its motion for judgment n.o.v. and in the alternative for a new trial. The district court entered its memorandum opinion indicating that it would require a remittitur as a condition for denying the motion for new trial on March 20, 1969. The plaintiff Gorsalitz filed his remittitur under protest on April 8, 1969. The final judgment for.$690,633.00 'with interest thereon from this date at the rate of six per cent (6%) per annum until paid' was entered on April 18, 1969.
 
 
 105
 A similar question was decided by the Second Circuit in Murphy v. Lehigh Valley R. Co., 1946, 158 F.2d 481, 485:
 
 
 106
 'Had there been no pending motion to set aside the verdict judgment could, and should, have been entered forthwith but the clerk in accordance with the Rule 58, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c . But after the motion was made it had to be decided before any judgment could be entered. The motion was granted conditionally with leave to the plaintiff to file a remittitur. This was done and the court made the judgment order on October 11, 1945. That was when the notation of the judgment in the civil docket should have been made and it became the judgment day. Rule 79(a). Since there was no date previous to October 11, 1945, on which the judgment could have, and should have, been entered it became the date from which interest was allowable. Louisiana & Arkansas R. Co. v. Pratt, 5 Cir., 142 F.2d 847.'
 
 
 107
 Whatever might be our ruling if we consider the procedural rules alone, a more substantial question as to the peculiar nature of the jury's verdict must be considered in this case. Interrogatory No. 6 and the jury's answer have been quoted early in this opinion. The interrogatory asked what amount of money 'if now paid in cash' will reasonably compensate the plaintiff. The court instructed the jury:
 
 
 108
 'In arriving at and assessing the damages to which the Plaintiff Gorsalitz is entitled, if any, you will award only such sum of money if paid now in cash as would fairly and reasonably compensate him for such damages as you may find, from a preponderance of the evidence, he has suffered as a direct and proximate result of the accident in question * * *.'
 
 
 109
 Thus the jury's verdict was based upon the premise that the amount answered be 'now paid in cash.' Upon this substantive basis, we think that the amount ultimately awarded by the court's final judgment should draw interest from October 10, 1968, the date of the jury's verdict.
 
 Olin's Appeal Against General Electric
 
 110
 Olin, in a third-party complaint against General Electric (G.E.), sought indemnification for its liability to Gorsalitz. The complaint was premised upon the provisions of an indemnity clause printed on the reverse side of a 'service order' submitted by Olin to G.E. several days before Gorsalitz's injury. The district court in a well-reasoned opinion entered judgment for G.E. On appeal Olin contends that, as a matter of law, the district court erred in failing to enter judgment for Olin pursuant to the indemnity agreement. However, we find that the district court properly entered judgment for G.E.
 
 
 111
 Initially, the conflict-of-laws question must be resolved. As a federal court in a diversity case, we must follow and apply the conflict rules of Texas. Klaxon Co. v. Stentor Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Center Chemical Co. v. Avril, Inc ., 5 Cir. 1968, 392 F.2d 289. We agree with the district court, and both parties are in accord, that the interpretation of a contract executed in Texas but to be performed wholly outside the state is governed by the law of the place of performance. Cockburn v. O'Meara, 5 Cir. 1944, 141 F.2d 779, 782; Castilleja v. Camero, Tex.1967, 414 S.W.2d 424, 426. Therefore, the law of Louisiana is controlling in our interpretation of Olin and G.E.'s indemnity agreement.[17]
 
 
 112
 The relevant portion of the indemnity clause provides:
 
 
 113
 '4. INDEMNITY. Contractor shall indemnify Owner against: (a) any claim, demand, suit, loss or liability (including counsel fees and related expenses) arising out of work performed hereunder resulting from (i) injuries to or death of any person or persons or damage to any property occasioned by acts or omissions, whether or not negligent, of Contractor's officers, employees, agents or subcontractors * * *.'
 
 
 114
 It is clear under Louisiana law that indemnification for one's own negligence must be specifically expressed and made unmistakably plain.[18] This principle of Louisiana law was best summarized by the court in Mills v. Fidelity & Casualty Co., W.D.La.1964, 226 F.Supp. 786, 790:
 
 
 115
 '* * * under Louisiana law an intention to indemnify the indemnitee against his own negligence will not be presumed in the absence of a clear and specific stipulation to that effect. Dubuque Fire, etc., Co. v. Union Compress & Warehouse Co., 146 F.Supp. 482 (W.D.La.1956); Buford v. Sewerage & Water Board of New Orleans, 175 So. 110 (La.App.Orl. Cir. 1937).
 
 
 116
 '* * * No Louisiana case has been cited, and none found in our independent research, containing a definitive statement of policy toward agreements purporting to indemnify the indemnitee against losses resulting from his own negligent acts. However, Buford, supra, makes it clear that such agreements are disfavored to the extent that they will not be enforced unless the terms of the agreement clearly require such interpretation.'
 
 
 117
 The critical language of the indemnification agreement under consideration is that G.E. agrees to indemnify Olin for any claim, loss, liability, etc., resulting from injuries, death or damages 'occasioned by acts or omissions, whether or not negligent, of (G.E.'s) officers, employees, agents or subcontractors * * *.' This language fails to meet the 'clear and specific' test of Louisiana law that G.E. intended to indemnify Olin for Olin's own negligence. To the contrary, a reasonable construction of the language would be that G.E. intended to indemnify Olin only for acts or omissions of G .E.'s employees. In that there is no evidence that Gorsalitz's injuries resulted from acts or omissions of G.E.'s officers, employees, agents or subcontractors,[19] Olin is precluded from seeking indemnification pursuant to the indemnification agreement.
 
 
 118
 Olin's entire argument is premised on Jennings v. Ralston Purina Co., supra, the only relevant Louisiana case which we have found that permitted indemnification for the indemnitee's own negligence. We must conclude, however, as did the district court, that Jennings is factually distinguishable. The indemnitee agreement in Jennings provided that the contractor-indemnitor hold the owner-indemnitee harmless from 'any loss, damage, liability and expense * * * directly or indirectly arising or growing out of the performance of this Contract * * *.' 201 So.2d at 174. The court concluded that, regardless of how strictly it construed the agreement, the indemnitor clearly and specifically agreed to indemnify the indemnitee against any loss caused by the negligence of the indemnitee or otherwise.
 
 
 119
 A comparison between the Jennings agreement and Olin and G.E.'s agreement demonstrates a clear and unequivocal intent in Jennings, as compared to the contrary intent in this case, to indemnify the indemnitee against his own negligence. That Jennings is distinguishable is also demonstrated by a recent Louisiana case which discusses Jennings and the other Louisiana cases in this area. Arnold v. Stupp Corp., La.App.1967, 205 So.2d 797, 799, 802-803.
 
 Conclusion
 
 120
 Insofar as concerns either Olin's appeal against Gorsalitz or Olin's appeal against General Electric, the judgments are affirmed. As to Gorsalitz's appeal, the respective amounts of the remittitur and of the final judgment are vacated and the case is remanded for redetermination of the amount of conditional remittitur and the entry of such orders and judgments as are not inconsistent with the foregoing opinion. The costs of appeal are taxed against Olin.
 
 
 121
 Affirmed in part, and in part vacated and remanded.
 
 
 122
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 123
 The Petition for Rehearing of Olin Mathieson Chemical Corporation is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12), the Petition for Rehearing En Banc is denied.
 
 
 
 [1]
 Electric Mutual Liability Insurance Company intervened to recover workmen's compensation benefits paid to plaintiff
 
 
 [2]
 This claim is based upon two Louisiana Statutes:
 '1032. Exclusiveness of rights and remedies; employer's liability to prosecution under other laws
 'The rights and remedies herein granted to an employee or his dependent on account of a personal injury for which he is entitled to compensation under this Chapter shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations.
 'Nothing in this Chapter shall affect the liability of the employer to a fine or penalty under any other statute.' '1061. Principal contractors; liability
 'Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.
 'Where the principal is liable to pay compensation under this Section, he shall be entitled to indemnity from any person who independently of this Section would have been liable to pay compensation to the employee or his dependent, and shall have a cause of action therefor.'
 LSA-R.S. 23:1032 and 23:1061.
 
 
 [3]
 Cone v. West Virginia Pulp & Paper Co., 1947, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849; Globe Liquor Co. v. San Roman, 1948, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177; Johnson v. New York, New Haven & Hartford R.R., 1952, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77; Yorkshire Indemnity Company v. Roosth & Genecov Production Co., 5 Cir. 1958, 252 F.2d 650; Ingalls v. Ingalls Iron Works Co., 5 Cir. 1958, 258 F.2d 750
 
 
 [4]
 See 5 J. Moore, Federal Practice & Procedure, 50.12 at p. 2365; 2B Barron & Holtzoff (Wright) Federal Practice & Procedure, 1081 at p. 429, note 11.1
 
 
 [5]
 We have considered treating the test prescribed in the court's instruction to the jury as the law of the case under our decision in Green v. American Tobacco Co., 5 Cir. 1963, 325 F.2d 673, 676. However, we do not stop with that test, because we have some doubt as to the applicability of our holding in Green under the facts of the instant case in the light of the well-reasoned decisions of the Eighth Circuit that an instruction to which no objection or only a general objection has been taken does not become the law of the case for the purpose of reviewing an order denying a motion for the direction of a verdict. Coca Cola Bottling Co. v. Hubbard, 8 Cir. 1953, 203 F.2d 859, 861-862; Hanson v. Ford Motor Co., 8 Cir. 1960, 278 F.2d 586, 593. See also 2B Barron & Holtzoff, Federal Practice & Procedure 1106, pp. 472-73 (Wright ed. 1961); 1B Moore Federal Practice 0.404(9) (2d ed. 1965)
 
 
 [6]
 Many such Louisiana cases are collected and discussed in this Court's decisions in Isthmian S.S. Co. v. Olivieri, supra; Hall v. Continental Drilling Co., 1957, 245 F.2d 717; Massey v. Rowan Drilling Co., 1966, 368 F.2d 92; and Arnold v. Shell Oil Co., 1969, 419 F.2d 43
 
 
 [7]
 For example: Horrell v. Gulf & Valley Cotton Oil Co., 1930, 15 La.App. 603, 131 So. 709; Ball v. Kaiser Aluminum & Chemical Corp., La.App.1959, 112 So.2d 741; Finn v. Employers' Liability Assurance Corp., La.App.1962, 141 So.2d 852; Shird v. Maricle, La.App.1963, 156 So.2d 476; Meche v. Farmers Drier & Storage Co., La.App.1967, 193 So.2d 807, writ denied ('Writ refused. On the facts found by the Court of Appeals there appears no error of law in its judgment.'), 250 La. 369, 195 So.2d 644; Schmolke v. Krauss Company, La.App.1969, 217 So.2d 789
 
 
 [8]
 See Boeing v. Shipman, 5 Cir. en banc 1969, 411 F.2d 365
 
 
 [9]
 The Louisiana Court of Appeals, Third Circuit, has recognized that a question of fact was presented when the case 'concerned construction and repair work not regularly done by the principal's employees and requiring special skills needed only at infrequent and irregular intervals.' Meche v. Farmers Drier & Storage Co., supra, 193 So.2d at 810
 
 
 [10]
 While we agree that 'The fact that the employer or the industry as a whole always contracts out the activity is not controlling', Arnold v. Shell Oil Co., supra, 419 F.2d at 50, the jury could properly attach considerable weight to that fact in a case of this kind
 
 
 [11]
 Since this opinion was prepared, our Court's opinion in Cole v . Chevron Chemical Co., 5 Cir., 1970, 427 F.2d 390 was filed. That decision strengthens materially the conclusion reached in the present case
 
 
 [12]
 Other Supreme Court cases approving the practice are collected by Professor Moore in 6A Moore's Federal Practice, P59.05(3), p. 3740 n. 9
 
 
 [13]
 Professor Moore notes that,
 'This justification has been thoroughly analyzed and attacked in an excellent article by Professor Carlin, Remittiturs and Additurs (1942) 49 W.Va.L.Q. 1.' 6A Moore's Federal Practice, P59.05(3), p. 3738 n. 6.
 
 
 [14]
 At another place in its memorandum, the district court expressed that '* * * in its considered opinion, the sum reflects the sentiments of an overly compassionate jury.'
 
 
 [15]
 With some additions, this description may serve the additional purpose of explaining the extent of the injuries. Part of the lower right jaw has been removed and the upper jaw bone is exposed. All of his teeth on the lower right jaw have been removed. He can't go out to dinner because 'I'm messy, trying to get it stuffed in the hole. I can't drink anything unless it's through a straw. I don't have any teeth on this side. I only chew on this side. It takes me three times as long to eat as what it does a normal person.' The lack of soft tissue and gum tissue causes poor nutrition and pieces of bone from the upper right jaw will continue to slough out. Gorsalitz's oral surgeon testified: 'Sometimes those bones will slough out by themselves, but during the process of sloughing out the patient goes sometimes through lots of pain, and if we are going to wait for this condition to take care of by itself it might require too long of a time
 'In addition to this, this piece of bone which is decaying, becoming infected, might damage the remaining of the soft tissue or hard structure tissue. This is why we feel that it is better according with the clinical adjustment at the time we see the patient, if it is wise to wait or maybe operate.'
 The operations are performed under local anesthetic. The patient continues mentally aware and feels some pain and discomfort. The surgeon foresees a probability of future operations to remove sharp pieces of bone and prevent pain and discomfort every three to six months:
 'A. Unless an operation could be done to cover this area of the sinus that is exposed. When I say 'exposed,' I mean when you see in Mr. Gorsalitz' mouth I can see the oral cavity and also you can see a big cavity into the sinus cavity. If this Area is closed and by 'closed' I mean you have to do some sort of grafting of some sort of soft tissue somewhere in the body or perhaps the mouth itself and try to close the entire cavity.
 'By closing the maxillary sinus perhaps we might get additional nutrition to cover the bone and maintain the bone in good condition, and this way perhaps we may not have any more pieces of bone working out. 'Q. Doctor, based on reasonable medical probability, what are some of the problems, if you are unable to stop this deterioration of the bone, that Mr. Gorsalitz will have in the future that you can foresee with any reasonable probability? 'A. The probabilities that the bone is just going to continue decaying, and whatever bone he has left, especially in this area of the sinus, some of the good bone remaining now might get involved, might get decay, and this bone here in the cheek is supporting the eye. The chances are, as my experience with some other patients before, not in this particular type of burn or injury, that there might be some eye problems associated with this. 'Q. What are those problems which you could reasonably expect again, based on reasonable medical probability, in Mr. Gorsaltz' case? 'A. He will gradually lose sight of his right eye due to the infection in the wall of the eye, and the bone supporting the eye structure.'
 Gorsalitz's right middle ear and his external ear have been destroyed. His seventh cranial nerve which supports motor functions to most of the muscles of expression of the face was destroyed. An opening into the maxillary sinus has persisted since his injury and food can get in and come out of his nose. He complains of headaches and dizziness on occasions. In a spell of dizziness shortly before the trial, he fell and broke his leg.
 
 
 [16]
 Of course, we may reverse for a strict error of law committed in the exercise of the district court's discretion, but that is rarely found
 
 
 [17]
 Both Olin and G.E. cite Texas authority in support of their arguments as to the indemnity agreement, but in light of the unanimous agreement that Louisiana law is controlling, we pretermit any discussion on the Texas authority
 
 
 [18]
 General Electric Co. v. Cuban American Nickel Co., 5 Cir. 1968, 396 F.2d 89, 93-94; Williams v. California Co., E.D.La.1968, 289 F.Supp. 376, 379; Despaux v. California Co., E.D.La.1968, 286 F.Supp. 558; Grigsby v. Coastal Marine Serv. of Texas, Inc., W.D.La.1964, 235 F.Supp. 97, 109-110; Mills v. Fidelity & Casualty Co., W.D.La., 226 F.Supp. 786, 790, aff'd per curiam, Yuba Consol. Industries, Inc. v. Fidelity & Cas. Co., 338 F.2d 341 (5 Cir. 1964); Arnold v. Stupp Corp., La.App.1967, 205 So.2d 797, 799; Jennings v. Ralston Purina Co., La.App.1967, 201 So.2d 168, 175; Brady v. American Ins. Co., La.App. 1967, 198 So.2d 907, 912. See also Batson-Cook Co. v. Industrial Steel Erectors, 5 Cir. 1958, 257 F.2d 410
 
 
 [19]
 In response to special interrogatories, the jury found that Olin's negligent acts were the proximate cause of Gorsalitz's injuries and absolved Gorsalitz of any contributory negligence. Olin offered no proof and requested no interrogatories concerning G.E.'s conduct