Aaron L. WARD, et al., Appellants,

v.

Clifford Ray SINCLAIR, Appellee.

No. 05–89–01149–CV.

Court of Appeals of Texas,
Dallas.

July 27, 1990.
Rehearing Denied Sept. 10, 1990.

Gary D. Jackson, Gloria A. Jackson, Dallas, for appellants.

Bill Boyd, McKinney, for appellee.

Before ENOCH, C.J., and HOWELL and ROWE, JJ.

## OPINION

ENOCH, Chief Justice.

Aaron L. Ward and James E. Ward, individually, and as successors to JADA, a Texas general partnership, sued Clifford Ray Sinclair alleging that Sinclair conspired to defraud the Wards in connection with conveyances of a tract of land.[1] The Wards received a favorable jury verdict; however, the trial court granted Sinclair's motion for judgment notwithstanding the verdict, from which the Wards now appeal. Finding no merit in the Wards' first and second points of error, we affirm the trial court's judgment.

JADA, a partnership owned 60% by the Wards, 20% by Danny Ray Todd, and 20% by Alan Wilson, contracted to buy a 4.896-acre tract of land (the tract) from LINJAC Colorado Corporation for investment purposes. JADA extended the closing date under the contract by the payment of additional earnest money. Eventually, the Wards allege, Todd falsely represented that no buyers or lenders could be found and that it would be more prudent to forfeit the earnest money they had already paid than to make another deposit of earnest money to, again, extend the closing, but then run the risk of forfeiting this greater sum. The Wards followed the advice of Todd and forfeited the earnest money; however, they later discovered that Todd and Wilson, in fact, purchased the tract for approximately $245,260.40 and im-

mediately sold it for $535,746 to Mike Faldmo (who worked for Sinclair), as trustee. Wilson and Todd received $169,538.68 from the sale. Faldmo divided the tract and conveyed the property in two transactions to Sinclair; the two tracts sold for a total of $867,746. Sinclair then sold the two pieces of property for $853,079 each. The Wards sued Sinclair and others alleging that they conspired to deprive the Wards of their share of the tract's value.[2]

In their first and second point of errors, the Wards assert that the trial court erred in granting Sinclair's motion for judgment notwithstanding the verdict because the evidence conclusively established, as a matter of law, Sinclair's liability for the tortious conduct and conspiracy of which the Wards complained, or alternatively, that the jury verdict is supported by factually sufficient evidence in their favor. The Wards assert that Sinclair and Wilson conspired to contribute the tract to the overall scheme to defraud Empire and that they have proved the elements of the conspiracy against them. The Wards concede that the primary conspiracy was the conspiracy to defraud Empire; however, they explain that "[l]ike a cesspool that overflows and contaminates nearby waters," Sinclair's scheme to defraud lenders engulfed Wilson and Todd and gave them an opportunity for profit on the tract that they could seize only by defrauding their partners, the Wards. Relying on *Bourland v. State*, 528 S.W.2d 350, 354 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.), the Wards assert that it is not essential that each conspirator

---

1. The transaction made the basis of this suit took place during the time period in which a number of condominium developments were conceived along Interstate 30 near Lake Ray Hubbard. The parties do not dispute that the condominium projects were a ruse in order to defraud Empire Savings and Loan Association by obtaining loans based upon false financial information and artificial increases in the value of land. Also, the record shows that JADA under the Wards' name had participated in a previous deal with Sinclair involving the purchase and resale of land in the I-30 corridor.

   At the outset, we note that the Wards walk a narrow line. They claim their damage is the result of being defrauded out of their ownership interest in the land, and they go to great lengths

to claim that their damage was something other than their share of the profits from the fraud perpetrated upon the lenders. The Wards know that this court is disinclined to assist in the fixing of liability or the distribution of damages emanating from an illegal enterprise. *See Kirby v. Cruce*, 688 S.W.2d 161, 169-72 (Tex.App.—Dallas 1985, writ ref'd n.r.e.) (Carver, J., dissenting). The Wards were on notice that they were on the threshold. *Ward v. Dallas Texas Nat'l Title Co.*, 735 S.W.2d 919, 922-24 (Tex.App.—Dallas 1987, writ ref'd n.r.e.) (Whitham, J., dissenting). Because of our disposition of this case, we do not reach this serious issue.

2. A more detailed recitation of the facts can be found in *Ward*, 735 S.W.2d at 921.

have knowledge of the details of the conspiracy or be shown to have acted in concert with the co-conspirators prior to or during each transaction. Moreover, the Wards maintain that a civil action will lie if the natural and necessary consequence of the acts of the conspirators is the oppression of an individual. *Great Nat'l Life Ins. Co. v. Chapa*, 377 S.W.2d 632, 635 (Tex. 1964). Thus, although the Wards concede that the acts of Wilson and Sinclair in utilizing the tract in the condominium scheme were directed primarily at the lenders and only incidentally at the Wards, they argue that the act of Wilson which defrauded and injured the Wards was committed in furtherance of the conspiracy to defraud Empire. The Wards claim, therefore, that Sinclair is liable for the consequences of the unlawful acts of his fellow conspirator, Wilson.

■ In order for a trial court to disregard a jury's findings and to grant a motion notwithstanding the verdict, it must determine that there is no evidence upon which the jury could have relied for its findings. *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987). In reviewing the granting of a motion for judgment notwithstanding the verdict, this Court must consider the evidence in the light most favorable to the party against whom the judgment was rendered, and every reasonable inference must be indulged in that party's favor. *Navarette v. Temple Indep. School Dist.*, 706 S.W.2d 308, 309 (Tex.1986); *Dowling v. NADW Marketing, Inc.*, 631 S.W.2d 726, 728 (Tex.1982). If there is more than a scintilla of competent evidence to support the jury's findings, then the judgment notwithstanding the verdict will be reversed. *Navarette*, 706 S.W.2d at 309.

■ Applying this standard, we must review the evidence in order to determine whether there is more than a scintilla of competent evidence to support the jury's finding that Sinclair joined in a conspiracy which defrauded the Wards. An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose by unlawful means. *Massey v.*

*Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). The elements of a conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or courses of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Id.* A conspiracy requires a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; there must be a preconceived plan and unity of design and purpose. *Zervas v. Faulkner*, 861 F.2d 823, 836 (5th Cir.1988), *citing Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex.1968). Thus, for a defendant to be liable for civil conspiracy to defraud, it must be shown not only that there was such a conspiracy but that the particular defendant charged agreed with one or more of the other conspirators on the claimed illegal *object* of the conspiracy and intended to have it brought about. *Zervas*, 861 F.2d at 836. An alleged conspirator is not liable for an act not done in pursuance of the common purpose of the conspiracy. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 928 (Tex.1979). Moreover, proof that an individual had some collateral involvement in a transaction, and had good reason to believe that there existed a conspiracy among other parties to it, is insufficient of itself to establish that the defendant was a conspirator. *Id., citing Schlumberger*, 435 S.W.2d at 857. The rationale behind this policy is based on the theory that holding a passive conspirator liable in tort for injuries outside the purpose of the common design would make him liable for results not proximately caused by his wrongful conduct. *See* Rembert, *An Actionable Civil Conspiracy Must Be Directed Toward the Injured Party and the Injury Must Be a Natural or Necessary Consequence of the Agreement*, 2 Hous.L.Rev. 146, 147–48 (1964).

Absent a finding of Sinclair's participation in a conspiracy to defraud the Wards, Sinclair may still be liable for the damages arising from the conspiracy if the complained of activity was the "natural and

necessary consequence" of the conspiracy to defraud the lenders. *Chapa*, 377 S.W.2d at 635. In other words, Wilson's act in defrauding the Wards must be a natural and necessary consequence of the conspiracy to defraud the lenders.

■■■ We now review the evidence in the light most favorable to the Wards, and every reasonable inference must be indulged in the Wards' favor.[3] It is undisputed that Sinclair was a member of a conspiracy to defraud Empire Savings. It is also undisputed that the conspiracy was carried out by obtaining loans based upon false financial information and manipulating artificial increases in the value of land through a series of simultaneous "land flips." In their brief, the Wards assert that Sinclair knew of the Wards' interest in JADA and, thus, in the tract, but that he instructed the check to be made payable to Wilson. To the contrary, the record shows that Aaron Ward testified that Sinclair "might not have" known of the Wards' interest in JADA, because JADA's prior dealing with Sinclair was conducted in the Wards' name, even though the Wards conducted the transaction on behalf JADA.[4] Also, the earnest money contracts and the contract of sale between LINJAC and JADA were signed by either Todd or Wilson. Further to the contrary, Wilson testified that at the closing on the sale of the tract from Wilson (JADA) to Faldmo, Sinclair was present when Lola Greene, who closed the transaction on behalf of Dallas Title Company, asked Wilson whether he had the ability or documentation to sign on behalf of JADA in order to close the transaction. Wilson testified that he told Greene, in the presence of Sinclair, that there was no partnership and that he did not have any problem with getting the documentation that she needed. Although the Wards' name came up during this conversation, it was in connection with Wilson explaining that the Wards were "no longer involved, they left Texas, they didn't have anything to do with this deal." To this, Sinclair responded that they should not "worry about the Wards and go ahead and close the deal." The Wards point out that although Sinclair originally had the check made out to JADA, rather than to Wilson, Wilson eventually received a check made payable to him.[5] Finally, the Wards point this court also to the testimony of Charles E. Cumming, Jr., a jeweler, who stated that he was on a cruise some time later with Sinclair and others when Sinclair stated that he "got in a verbal fight with someone named Ward over a piece of property, and he [Sinclair] found a way to deal them a severe blow, or get even and get what he wanted at the same time."

Although Sinclair was aware of the fact that JADA was involved in the transaction, there is no evidence showing that Sinclair, prior to actual closing on the tract, knew that the Wards were investor-members of JADA. Todd and Wilson, not the Wards, signed the contract of sale and the earnest money contracts. Additionally, assuming Sinclair knew the Wards were a part of JADA, the only testimony regarding dealings at the closing shows that Wilson assured the title company, in Sinclair's presence, that the partnership no longer existed and that he (Wilson) could supply documentation to that effect. The only testimony showing that Sinclair, at least, heard the Wards' names was in connection with Wilson asserting that the Wards had no interest in the tract. With regard to Sinclair's statement to Cumming, its materiality to this case is too speculative to accord it any probative value. It was made at an unspecified time after the events of which the

---

3. We note that a videotape of Sinclair's deposition was played to the jury at trial; however, no transcription of that testimony was brought up on appeal. Thus, we will presume that anything omitted from the record supported the trial court's judgment. Tex.R.App.P. 53(d).

4. In his deposition taken prior to trial, Aaron Ward stated that the name JADA was not mentioned to Sinclair during the previous transac-

tion. Aaron Ward also testified in his deposition that neither he nor his brother mentioned the names Danny Todd or Alan Wilson to Sinclair during that previous transaction.

5. At another point in his testimony, Wilson said that this check was made payable to ADWN, Inc., a corporation of which Wilson was president.

Wards complain. Further, there is no evidentiary tie establishing that the statement was made with regard to Aaron and James Ward, or that the "get even" was a conspiracy to defraud the Wards of their profit on the sale of the tract.

Indulging every reasonable inference in favor of the Wards, we conclude that there is not more than a scintilla of competent evidence either to support a fact finding that Sinclair conspired to defraud the Wards or support a finding that the injury to the Wards was a natural and necessary consequence of the original conspiracy to defraud the lenders. As previously stated, Sinclair violated statutes which were designed to protect financial institutions. The purpose of the conspiracy was to obtain loans based upon false financial information and artificial increases in the value of land. There is a complete lack of evidence in the record that the conduct of Wilson in not sharing the profits of the sale of the land with the Wards in any way furthered the conspiracy. To the contrary, the unequivocal evidence demonstrates that the price paid by Sinclair for JADA's land was not affected in any way by Wilson's cutting the Wards out of their share. That is to say, there is no evidence that as a natural and necessary consequence of defrauding real estate lenders, Wilson had to fail to share the proceeds from the sale of the JADA land with the Wards. The complained of jury findings were, therefore, properly disregarded. We overrule the Wards' first and second points of error.

Because of our disposition of the Wards' first and second points of error, the Wards' third, and fourth points of error and Sinclair's cross-points need not be addressed.